UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

SELL IT SOCIAL, LLC (D/B/A COUNTRY HABIT),

                      Plaintiff,

        -against-

ACUMEN BRANDS, INC. (D/B/A COUNTRY
OUTFITTER),

                    Defendant.

-------------------------------------------------------------------x

JURY TRIAL DEMANDED

CIVIL ACTION NO.

14 cv 3491 RMB

**COMPLAINT**

FILED
MAY 14 2014
USDC WP SDNY

       Plaintiff Sell It Social, LLC D/B/A Country Habit ("Sell It Social"), by their attorneys Pollock & Maguire, LLP, as and for its Complaint against Acumen Brands, Inc. (D/B/A Country Outfitter) ("Acumen") herein, alleges:

### JURISDICTION AND VENUE

       1.  This Court has original, subject matter jurisdiction over the First, Second, and Third Claims for Relief, which are asserted against Acumen under the Sherman Act (15 U.S.C. §1 and §2) the Clayton Act (15 U.S.C. § 14) and seek treble damages from Acumen for its violations of the federal antitrust laws.  This Court has jurisdiction over the remaining Claims for Relief, sounding in intentional interference with prospective business advantage, intentional interference with contract, defamation and commercial disparagement, and unfair competition, pursuant to the doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because those Claims for Relief all arise from the same transactions and common nucleus of operative facts as Plaintiff's federal antitrust claims.

2.   This Court also has jurisdiction over this action under 28 U.S.C. §1332 inasmuch as there exists complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.   Venue is proper in the Southern District of New York pursuant to the Clayton Act, 15 U.S.C. §22 and pursuant to 28 U.S.C. § 1391, because Acumen transacts business in the Southern District of New York, including maintaining active websites through which it carries out interstate commerce, having partnerships with New York entities, and otherwise transacting business within the district.

## PARTIES

4.   Plaintiff Sell It Social is a Limited Liability Company organized and existing under the laws of the State of New York with its principal of place of business at 336 West 37th Street, Suite 405, New York, New York 10018.

5.   Defendant Acumen is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1936 N. Shiloh Drive, Fayetteville, Arkansas.

## INTRODUCTION

6.   This action arises from a campaign by Defendant Acumen to maliciously destroy the ecommerce business of a start-up competitor, Plaintiff Sell It Social, by disseminating to vendors in the relevant product market vicious falsehoods concerning Sell It Social's integrity and business practices, intimating to those vendors that Acumen would not do business with them if they sold their products on the Sell It Social web-site, CountryHabit.com, and conspiring and arranging with

2

certain vendors in the market to refuse to deal with Sell It Social.  In particular, disparaging communications were transmitted by email on May 5, 2014, and have already resulted in a number of terminated contracts, and refusals to deal with Sell It Social and its CountryHabit.com web-site. Defendant's conduct threatens the very existence of the web-site, and has had the intended effect of excluding Sell It Social from the market and preserving Acumen's dominant market share, in violation of the U.S. antitrust laws, as well as constituting business torts under common law.

## NATURE OF RELEVANT MARKET

7.   The relevant product market is the online sale and distribution of men's and women's country and western apparel and accessories, including cowboy and cowgirl boots, t-shirts, belts, wares, accoutrements and goods associated with the country and western lifestyle ("the Country and Western Online Retail Market").

8.   Acumen operates a portfolio of ecommerce websites, including its flagship brand CountryOutfitter.com ("Country Outfitter"), a website in the Country and Western Online Retail Market.

9.   Acumen engages in interstate commerce across the internet through Country Outfitter and its various other ecommerce websites, and is backed by venture capitalists and partners that have invested over $90 Million Dollars for minority interests in the company since 2012.   Among those partners and investors are General Atlantic, LLC, Dillards, Inc., and the State of Arkansas through the Arkansas Risk Capital Management Fund.

10.   Country Outfitter's revenues in 2013 exceeded $70 million.

3

11.   Country Outfitter is the dominant retailer in the Country and Western Online Retail Market, having a controlling market share.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

12.   Sell It Social was organized on March 18, 2013 and operates online "e" retail websites that market lifestyle specific apparel, shoes, accessories, goods and wares directly to highly engaged special interest audiences through social media.

13.   An important component of the Sell It Social business is its ability to use the same marketing strategy and web site layout and design as a platform to market to multiple special interest audiences.

14.   Unlike Country Outfitter, which follows the classic retail model by purchasing directly from vendors and physically housing the products in its warehouse, Sell It Social's websites are "drop ship", meaning that they market products for sale and accept customer orders, but do not keep the goods in stock in warehouses, instead transferring customer orders and shipment details directly to the vendor, who then ships the goods directly to the consumer with Sell It Social's shipping labels.

15.   Sell It Social currently operates two online "e" retail websites, www.rebelcircus.com ("Rebel Circus"), and www.countryhabit.com ("Country Habit").

16.   The Rebel Circus website targets the "alternative" fashion market, and was launched on March 28, 2013.

17.   Capitalizing on Sell It Social's strategy of marketing to large, loyal, and engaged audiences through various social media platforms such as Facebook, Twitter, and Instagram,

Rebel Circus became profitable in its first six (6) months, and its revenues exceeded $3.3 million in its first fiscal year.

18.   In June or July of 2013, with the early success of Rebel Circus validating the Sell It Social business model, and in particular its targeted social media marketing strategy, Sell it Social decided to enter into the Country and Western Online Retail Market, and began planning to launch the Country Habit website in early 2014.

19.   After investigating country and western apparel and boot manufacturers, Sell It Social made substantial investments to launch Country Habit, spending the second half of 2013 and the first months of 2014 cultivating a country and western following through its various social media platforms, hiring people to manage the fan pages, grow audiences, and contact vendors, as well as developing an information technology team to build the Country Habit website, and entering into third party technology partnerships.

20.   In February of 2014, Sell It Social's principal, Heath Wolfson, was introduced to Ben Roberts, Acumen's Director of Brand Operations and Vice President of Marketing Operations and, upon learning from Wolfson at a trade show in Las Vegas that Sell It Social intended to enter the Country and Western Online Retail Market, Roberts sought meetings with Wolfson at Sell It Social's offices in New York under the guise of exploring a common business goal and exchanging information.   In the course of their meetings, which took place in February and March of 2014, Roberts learned many of the details concerning Sell It Social's plan to launch Country Habit, its social media marketing strategy, the engaged country and western audiences that Sell It Social had already built, its timetable and projections for Country Habit, and the already successfully launched Rebel Circus website.

21.    Threatened by Sell It Social's successful track record as a lifestyle targeted e-retailer, and armed with information learned through Roberts' contacts with Sell It Social, Acumen began a malicious campaign to commercially disparage Country Habit, Sell It Social, and its management, with the intent of disrupting Country Habit's business and restraining competition in the Country and Western Online Retail Market so that Country Outfitter could maintain its dominant market position.

22.    Sell It Social has projected its first year revenues to more than double those of Rebel Circus.   With the "know how" and audience gained from already having launched Rebel Circus, Sell It Social was in a strong position to enter the Country and Western Online Retail Market, having the ability to reach several hundred million people per week, and having secured over nine million "friends", "fans", "likes" and "followers" on its various social media platforms, including an engaged country and western lifestyle audience that exceeded two million prior to the launch of Country Habit, as well as commitments from various vendors in the market to sell their products through the Country Habit website.

23.    Sell It Social has entered into formal contracts with dozens of apparel, accessory and boot vendors in the Country and Western Online Retail Market to sell their products through Country Habit, as well as informal agreements with other vendors that were enthusiastic about selling their products on Country Habit.

24.    Sell It Social was still approaching vendors in the Country and Western Online Retail Market when it launched the Country Habit website on April 22, 2014, and it has continued to seek out vendors after the launch.

25.  As a symbol of country and western culture and heritage, country and western cowboy and cowgirl boots are especially critical to the success of an ecommerce retailer in the Country and Western Online Retail Market.

26.  Sell It Social therefore sought out and secured agreements with leading country and western cowboy and cowgirl boot vendors, including Dan Post, Ferrini, Roper, Laredo, and Tough Rider, for the sale of their boots on the Country Habit website.

27.  Many vendors with whom Country Habit secured agreements also had non-exclusive agreements to sell their products through Country Outfitter.

28.  In the first two weeks after the Country Habit website went "live" on April 22, 2014, it had stronger sales than Sell It Social's other website, Rebel Circus.

29.  On May 5, 2014, in furtherance of its campaign to destroy Sell It Social and its Country Habit website, Acumen sent correspondence (annexed as Ex. A) to vendors in the Country and Western Online Market, that contains false and misleading statements that lead readers to conclude that, in connection with the launch of the Country Habit website, Sell It Social wrongfully misappropriated and is improperly using Country Outfitter's intellectual property on their website.  The letter sent by Acumen, which was widely disseminated in the Country and Western Online Market, pressures readers not to do business with Country Habit.

30.  The letter sent by Acumen's Chief Executive Officer, John James, reads:

> **Dear Valued Supplier,**
>
> **This Letter will serve as notice regarding our position towards the website Country Habit.com.  We find their blatant use of our CountryOutfitter.com designs, imagery and intellectual property deplorable.**

> Our entire industry was built around trust, honesty, and respect. Country Habit chose to enter our industry without any of these tenants [sic].
>
> After an initial discussion with their leadership, Country Habit retracted their most flagrant abuses but continues to use tactics of seeming association with Country Outfitter to try and secure products from our supplier base. We ask that you take into full consideration forgoing [sic] all current or future business with this company.
>
> We value and appreciate the partnership we have built with your brands, and we trust you understand our position and will stand alongside us.
>
> Sincerely,
>
> John James, M.D.
> CEO-Country Outfitter

31.   The letter sent by Acumen is false and defamatory in that it falsely claims that the Country Habit website uses CountryOutfitter.com's designs, imagery and intellectual property.

32.   The design and layout of Country Habit's website is not in any respect based upon Country Outfitter's site, but instead is an exact replica of Sell It Social's previously developed Rebel Circus website.

33.   The intellectual property associated with Sell It Social's social media marketing plan for Country Habit mimics the social media marketing plan it employed for Rebel Circus in the rebel and alternative lifestyle market, and is not based upon any proprietary information of Country Outfitter or Acumen.

34.   The letter sent by Acumen was intended to and does convey to vendors in the Country and Western Online Retail Market that if they did business through the Country Habit website, they would not be permitted to sell their products on Country Outfitter, has caused Country Habit's

8

vendors to feel intimidated, conflicted, and has led many of Country Habit's vendors to cancel their contracts with Sell it Social, and others that had been enthusiastic about dealing with Sell It Social to stop communicating with it.

35.   The letter sent by Acumen is also false in that it states that Country Habit entered the Country and Western Online Retail Marketplace without trust, honesty, or respect.

36.   Trust, honesty and respect are foundational tenets of Country Habit and Sell It Social.

37.   Acumen either knew that the claims that Country Habit had misappropriated and used Country Outfitter's designs, imagery and intellectual property, and that Country Habit entered the Country and Western Online Retail Market without trust, honesty and respect, were false, misleading, and unsupported, or was reckless as to the truth of such statements, and it made those statements either recklessly, or with intent to deceive.

38.   Country Outfitter sent the letter to Country Habit's vendors and potential vendors in an attempt to dissuade them from doing business with Country Habit and make it impossible for Sell It Social to gain a foothold in the Country and Western Online Retail Market.

39.   Country Outfitter's conduct in falsely stating to vendors in the Country and Western Online Retail Market that Country Habit entered that marketplace without trust, honesty and respect was maliciously calculated to destroy Sell It Social's business, since trust, honesty and respect are essential components to the relationship between an "e" retailer and its vendors.

40.   Since the dissemination of Acumen's disparaging letter, Sell It Social has received emails and phone calls from vendors that had received the letter, with many terminating their agreements to sell products on the Country Habit website and directing Country Habit to remove

their products, and other vendors directing Country Habit to remove their products while they reconsidered.

41.   Ecommerce retailers such as Sell It Social are typically subjected to a comprehensive vetting process by their vendors, that includes an application, a review of references, credit checks, and research prior to approval, so it is particularly unusual that vendors would terminate their relationship with Country Habit, or suddenly stop communicating with it without explanation, after having gone through that process, and the sudden termination of agreements and relationships with Sell It Social, often without explanation, demonstrates that those vendors were intimidated, pressured, coerced, or threatened by Country Outfitter.

42.   Many other vendors expressed interest when they were initially contacted and then suddenly cut off communications after Acumen began its campaign to commercially disparage Country Habit.

43.   Other vendors approved their merchandise to be sold on the Country Habit website and then never followed through with signing contracts, supplying products, or further communications.

44.   The first sixty days of an ecommerce website's launch are critical in the eyes of investors, and Acumen's campaign of intimidating and coercing Country Habit's vendors to dissuade them from doing business with Sell It Social has destroyed the momentum of the Country Habit launch, causing extensive damage to Sell It Social.

45.   Several key boot vendors, including Ferrini and Roper, have either terminated their agreements with Sell it Social, delayed authorizing Country Habit to market their boots for sale, or withheld their products from the website.

10

46.   On May 6, 2013, just one day after Country Outfitter circulated its false, misleading and disparaging letter aimed at destroying the Country Habit business, Country Habit received an email from Mark Claver, the National Sales Manager for Ferrini USA, Inc., one of the largest boot vendors in the Country and Western Online Retail Market that had already entered into an agreement to sell its boots on the Country Habit website, that stated:

> We have determined that it is not in the best interest of our company to continue our vendor agreement with Country Habit.   Ferrini USA, Inc. is terminating our vendor agreement with Sell It Social, LLC dba Country Habit.   Please prepare to remove all Ferrini product, logos and company information from the Country Habit website.

47.   Other boot vendors may follow suit and terminate their relationships with Sell It Social as a result of Country Outfitter's disparaging, defamatory, and anticompetitive conduct.

48.   Acumen's disparaging, defamatory, and anticompetitive conduct has also caused other vendors, such as Dickies (an apparel vendor), Richochet Rounds (a Jewelry Vendor), and Country Deep (a t-shirt vendor), to terminate their retail arrangements with Country Habit.

49.   Acumen had known for several months that Sell It Social was recruiting vendors, obtaining fans, and otherwise preparing to enter into the Country and Western Online Retail Market, yet intentionally and deliberately waited until around the time of the launch of the Country Habit website to begin a campaign to commercially disparage Sell It Social in order to thwart the launch of Country Habit and destroy Sell It Social's business. Sell It Social's business model is based upon it having a platform by which it can launch multiple successful lifestyle targeted "e" retail websites into different marketplaces, and a failure to successfully launch its second lifestyle targeted "e" retail website will discourage potential vendors and venture capital investor interest, as well as destroy company moral, jeopardize employees' jobs, and stall the company's growth.

11

## AS AND FOR A FIRST CLAIM FOR RELIEF:
## VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST ACT

50.  Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 49 as fully set forth herein.

51.  Acumen's Country Outfitter website is the largest "e" retailer in the Country and Western Online Retail Market and, by virtue of its dominant market share, Acumen has the power to monopolize the market.

52.  Acumen's dominant market share in the Country and Western Online Retail Market allows it to control prices and exclude and restrain competition.

53.  Acumen has willfully and intentionally engaged in anticompetitive conduct in order to restrain competition, monopolize, or attempt to monopolize the Country and Western Online Retail Market.

54.  Acumen is acting with the intent to achieve a monopoly, and given its market control, it has a reasonable probability of achieving, or has already achieved, monopoly power.

55.  Acumen has intimidated vendors in the Country and Western Online Retail Market into refusing to deal with Sell It Social, with the intent of restraining competition, monopolizing, or attempting to monopolize the Country and Western Online Retail Market.

56.  Acumen's conduct has effectively restrained, and threatens to further restrain competition in the Country and Western Online Retail Market by:

(a)  coercing vendors to exclude Sell It Social from the market;

(b)  entering into agreements and arrangements with vendors to exclude Sell It Social from the market;

12

(c)    conspiring with vendors, manufacturers and retailers to exclude Sell It Social from the market and destroy its business;

(d)    misleading vendors, manufacturers and retailers in the market by commercially disparaging and defaming Sell It Social, in order to accomplish its anticompetitive goals; and

(e)    interfering with Sell It Social's existing contracts and business relationships by disseminating false and disparaging information about Sell It Social to its vendors and potential vendors in the Country and Western Online Retail Market.

57.    The foregoing anticompetitive acts constitute violations of the United States Antitrust laws, in particular, Section 2 of the Sherman Act (15 U.S.C. § 2).

58.    As a direct, foreseeable, and proximate result of Acumen's anticompetitive, and monopolistic conduct, Sell It Social has been damaged, in an amount to be determined at trial, through (a) loss of business from existing vendors that had agreed to sell their products on Country Habit, (b) loss of business caused by Acumen's interference with potential vendors and business relationships it had cultivated in the Country and Western Online Retail Market, and (c) damage to Sell It Social's core business as a result of the potential failure of the Country Habit website and resultant failure of investors to support, grow and develop that business.

59.    As a direct, foreseeable, and proximate result of Acumen's anticompetitive and monopolistic conduct, competition, vendors, suppliers, retailers, distributors, and customers in the Country and Western Online Retail Market have been damaged because (1) consumers in the Country and Western Online Retail Market will be deprived of Sell It Social's social media

13

marketing plan, and (2) Acumen will be in a position to control the prices charged to consumers in that market as well as the percentage of each sale that it takes from vendors.

## AS AND FOR A SECOND CLAIM FOR RELIEF:
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

60.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 59 as fully set forth herein.

61.   Acumen, in concert with boot vendors such as Ferrini, as well as other vendors in the Country and Western Online Retail Market, has agreed, contracted, arranged, or otherwise conspired to restrain interstate commerce in the Country and Western Online Retail Market.

62.   In particular, Acumen has coerced vendors in the Country and Western Online Retail Market not to do business with Sell It Social, and those vendors that have acquiesced to Acumen's coercion and refused to deal with Sell It Social, are a party to Acumen's conspiracy.

63.   Acumen's conduct constitutes a violation of the United States Antitrust laws, in particular, the Sherman Act (15 U.S.C. § 1).

64.   As a direct, foreseeable, and proximate result of Acumen's anticompetitive conspiracy to restrain trade in the Country and Western Online Retail Market, Sell It Social has been damaged in an amount to be determined at trial through the (a) loss of business from existing vendors that had agreed to sell their products on Country Habit, (b) loss of business caused by Acumen's interference with potential vendors and business relationships it had cultivated in the Country and Western Online Retail Market, and (c) damage to Sell It Social's core business as a

result of the potential failure of the Country Habit website and resultant failure of investors to support that business.

65. As a direct, foreseeable, and proximate result of Acumen's anticompetitive conspiracies to restrain trade, competition, vendors, suppliers, retailers, distributors, and customers in the Country and Western Online Retail Market have been damaged because (1) consumers in that market will be deprived of Sell It Social's social media marketing plan, and (2) Acumen will be in a position to control the prices charged to consumers in that market as well as the percentage of each sale that it takes from vendors.

**AS AND FOR A THIRD CLAIM FOR RELIEF:**
**VIOLATION OF SECTION 3 OF THE CLAYTON ACT**

66. Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 65 as fully set forth herein.

67. Acumen, in the course of interstate commerce, has entered into agreements and arrangements ("the Refuse to Deal Agreements") with various vendors in the Country and Western Online Retail Market pursuant to which Acumen will sell and market certain products on the condition that those vendors do not deal with Sell It Social.

68. The intention of the Refuse to Deal Agreements is to restrain competition in the Country and Western Online Retail Market by destroying Country Habit in order to solidify a monopoly in the market for Acumen.

69. The result of the Refuse to Deal Agreements is to restrain competition in the Country and Western Online Retail Market, and to solidify the monopoly in the market for Acumen.

70.   In the course of entering into the Refuse to Deal Agreements to restrain competition and solidify a monopoly in the market for Acumen, Acumen has defamed and commercially disparaged Sell It Social.

71.   In addition to commercially disparaging and defaming Sell It Social, Acumen has also pressured and intimidated vendors, manufacturers, and retailers in the Country and Western Online Retail Market to refuse to deal with Sell It Social in an attempt to exclude Sell It Social from the market, restrain competition, and solidify its monopoly.

72.   By virtue of the foregoing, Acumen has violated the Clayton Act, 2 U.S.C § 14.

73.   As a direct, foreseeable, and proximate result of Acumen's intimidation, defamation, and the Refuse to Deal Agreements, Sell It Social has been damaged in an amount to be determined at trial through the (a) loss of business from existing vendors that had agreed to sell their products on Country Habit, (b) loss of business caused by Acumen's interference with potential vendors and business relationships it had cultivated in the Country and Western Online Retail Market, and (c) damage to Sell It Social's core business as a result of the potential failure of the Country Habit website and resultant failure of investors to support that business.

74.   As a direct, foreseeable, and proximate result of Acumen's intimidation, defamation, and the Refuse to Deal Agreements, competition, vendors, suppliers, retailers, distributors, and customers in the Country and Western Online Retail Market have been damaged because (1) consumers in the Country and Western Online Retail Market will be deprived of Sell It Social's social media marketing plan, and (2) Acumen will be in a position to control the prices charged to consumers in that market as well as the percentage of each sale that it takes from vendors.

## AS AND FOR A FOURTH CLAIM FOR RELIEF:
## INTENTIONAL TORTIOUS INTERFERENCE
## WITH PROSPECTIVE BUSINESS ADVANTAGE

75.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 74 as fully set forth herein.

76.   Acumen knew that Sell It Social was cultivating business relationships in the Country and Western Online Retail Market prior to disseminating the letter it sent to vendors.

77.   Acumen knew that Sell It Social had existing business arrangements in the Country and Western Online Retail Market prior to disseminating the letter it sent to vendors.

78.   Acumen disseminated the disparaging and defamatory letter to Sell It Social's existing vendors and prospective vendors in the Country and Western Online Retail Market with the intent to interfere with Sell It Social's existing business relationships and its prospective business relationships.

79.   Attempting to intentionally interfere with Sell It Social's prospective business relationships, Acumen has intimidated vendors in the Country and Western Online Retail Market by intimating that if they do business with Sell It Social, it will not do business with them.

80.   Acumen acted maliciously with the intent to harm or destroy Sell It Social's business in the Country and Western Online Retail Market.

81.   The letter sent by Acumen and Acumen's intimidation tactics have coerced numerous vendors into refusing to deal with Sell It Social, including Ferrini, Roper, Dickies, Country Deep, and Ricochet Rounds.

82.   Additional vendors are likely to refuse to deal with Sell It Social.

83.  Sell It Social has been damaged, in an amount to be determined at trial, as a direct, foreseeable, and proximate result of Acumen's interference with its prospective business relationships through (a) loss of business from existing vendors that had agreed to sell their products on Country Habit, (b) loss of business caused by Acumen's interference with potential vendors and business relationships that Sell It Social had cultivated in the Country and Western Online Retail Market, and (c) damage to Sell It Social's core business as a result of the potential failure of the Country Habit website and resultant failure of investors to support that business.

## AS AND FOR A FIFTH CLAIM FOR RELIEF:
## INTENTIONAL TORTIOUS INTERFERENCE WITH CONTRACT

84.  Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 83 as fully set forth herein.

85.  On May 5, 2014, Sell It Social had existing contracts and agreements in place with vendors in the Country and Western Online Retail Market.

86.  Acumen had knowledge that Sell It Social had existing contracts and agreements in place with vendors in the Country and Western Online Retail Market when it disseminated defamatory and commercially disparaging information to Sell It Social's vendors and prospective vendors.

87.  In addition to disparaging Sell It Social, Acumen engaged in intimidation tactics with the intent to induce Sell It Social's vendors to breach their existing contracts and agreements with Sell It Social.

88.  Certain vendors, including Ferrini and Country Deep have breached their agreements with Sell It Social as a result of Acumen's conduct.

18

89.  By virtue of the foregoing, Sell It Social has been damaged in an amount to be determined at trial through the loss of business from existing vendors that had agreements to sell their products on Country Habit and were induced by Acumen to breach those agreements.

## AS AND FOR A SIXTH CLAIM FOR RELIEF:
## DEFAMATION AND COMMERCIAL DISPARAGEMENT

90.  Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 89 as fully set forth herein.

91.  Acumen disseminated a false and defamatory letter to Sell It Social's vendors and prospective vendors maliciously, with the intent to commercially disparage Sell It Social and damage its business.

92.  Sell It Social has suffered damage in an amount to be determined at trial on account of Acumen's false and defamatory conduct through (a) loss of business from existing vendors that had agreed to sell their products on Country Habit, (b) loss of business caused by Acumen's interference with potential vendors and business relationships it had cultivated in the Country and Western Online Retail Market, and (c) damage to Sell It Social's core business as a result of the potential failure of the Country Habit website and resultant failure of investors to support that business.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF:
## UNFAIR COMPETITION

93.  Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 92 as fully set forth herein.

94.   Acumen's conduct described herein constitutes the common law tort of unfair competition.

95.   Sell It Social has suffered damage by virtue of Acumen's unfair competition in an amount to be determined at trial, including (a) loss of business from existing vendors that had agreed to sell their products on Country Habit, (b) loss of business caused by Acumen's interference with potential vendors and business relationships that Sell It Social had cultivated in the Country and Western Online Retail Market, and (c) damage to Sell It Social's core business as a result of the potential failure of the Country Habit website and resultant failure of investors to support that business.

**WHEREFORE**, the Plaintiff demands a trial by jury and that judgment be entered in its favor, against Defendant Acumen Brands, Inc., as follows:

(a)   On the First Claim for Relief, awarding compensatory damages in accordance with the federal antitrust and unfair competition laws in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars ($50,000,000.00), together with an award of treble damages, pre-judgment and post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

(b)   On the Second Claim for Relief, awarding compensatory damages in accordance with the federal antitrust and unfair competition laws in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars ($50,000,000.00), together with an award of treble damages, pre-judgment and post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

(c)   On the Third Claim for Relief, awarding compensatory damages in accordance with the federal antitrust and unfair competition laws in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars ($50,000,000.00), together with an award of treble damages, pre-judgment and post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

(d)   On the Fourth Claim for Relief, awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars ($50,000,000.00), together with an award of punitive damages on account of defendant's malicious conduct, pre-judgment and post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

(e)   On the Fifth Claim for Relief, awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than Ten Million Dollars ($10,000,000.00), together with an award of punitive damages on account of defendant's malicious conduct, pre-judgment and post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

(f)   On the Sixth Claim for Relief, awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars ($50,000,000.00), together with an award of punitive damages on account of defendant's malicious, defamatory conduct, pre-judgment and post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

(g)   On the Seventh Claim for Relief, awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars

($50,000,000.00), together with an award of punitive damages on account of defendant's malicious, anticompetitive conduct, pre-judgment and post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees; together with

      (h)  such other and further relief as the Court may deem just and proper.

Dated: White Plains, New York
      May 14, 2014

                           **POLLOCK & MAGUIRE, LLP**

                           By: _____
                                 Peter S. Dawson (PD1618)
                           *A Member of the Firm*
                           Attorneys for Plaintiff
                           4 West Red Oak Lane, Suite 302
                           White Plains, New York 10604
                           (914) 251-1525

# EXHIBIT A



**COUNTRY OUTFITTER**
— WE KNOW COUNTRY —

May 5, 2014

Dear Valued Supplier,

This letter will serve as notice regarding our position towards the website CountryHabit.com. We find their blatant use of our CountryOutfitter.com designs, imagery, and intellectual property deplorable.

Our entire industry was built around trust, honesty, and respect. Country Habit chose to enter our industry without any of these tenants.

After an initial discussion with their leadership, Country Habit retracted their most flagrant abuses but continues to use tactics of seeming association with Country Outfitter to try and secure products from our supplier base. We ask that you take into full consideration forgoing all current or future business with this company.

We value and appreciate the partnership we have built with your brands, and we trust you understand our position and will stand alongside us.

Sincerely,

John James, M.D.
CEO - Country Outfitter