UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SELL IT SOCIAL, LLC (D/B/A COUNTRY HABIT),

                Plaintiff,

        -against-

ACUMEN BRANDS, INC. (D/B/A COUNTRY
OUTFITTER),

                Defendant.

-------------------------------------------------------------------x

JURY TRIAL DEMANDED

CIVIL ACTION NO: 14-cv-3491

Hon. Richard M. Berman

**AMENDED COMPLAINT**

## INTRODUCTION

1.     This case involves the anticompetitive, tortious and defamatory conduct of a monopolist, Acumen Brands, Inc. ("Acumen"), to eliminate competition in the online country and western apparel market. Faced with a threatening new entrant, Sell It Social, LLC ("Sell It Social"), Acumen acted with specific intent to harm Sell It Social's business and thereby eliminate the unique competitive threat to its monopoly position that Sell It Social's successful entry into the online country and western apparel market would have posed.

2.     Acumen's exclusionary and tortious conduct consists of the adoption, communication, and threatened enforcement of a coercive policy of refusing to deal with vendors that do business with Sell It Social and the dissemination of false, misleading, and defamatory claims about Sell It Social and its management to those same vendors. The actual and intended purpose and effect of Acumen's conduct has been to deter vendors from doing business with Sell It Social. In this way, Acumen has avoided competition on the merits with Sell It Social,

1

unlawfully maintaining Acumen's monopoly to the detriment of consumers and Sell It Social alike.

3.      Plaintiff brings this lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages suffered by the Plaintiff and the costs of suit, including reasonable attorney's fees; to enjoin Defendant's anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendant's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

4.      Plaintiff also seeks compensatory and punitive damages for Defendant's unlawful libel, slander, and tortious interference with its prospective business relations with vendors of country and western apparel and accessories.

## THE PARTIES

5.      Plaintiff Sell It Social is a limited liability company organized and existing under the laws of the State of New York, with its principal of place of business at 336 West 37th Street, Suite 210, New York, New York 10018.  Sell It Social's members are Heath Wolfson (a citizen of New Jersey) and Peter Stiler (a citizen of New York).

6.      Defendant Acumen is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1936 N. Shiloh Drive, Fayetteville, Arkansas.

## JURISDICTION AND VENUE

7.      Plaintiff brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, arising from Defendant's violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §  2, as well as to obtain injunctive relief.

2

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. §§ 15, 26.  This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

9.     This Court also has jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.    Plaintiff has standing to bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15.

11.    Venue is proper in the Southern District of New York under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because the Defendant transacts business and is found within the Southern District of New York, and because a substantial part of the events giving rise to the Plaintiff's claims occurred within the Southern District of New York.

12.    Defendant engages in, and its activities substantially affect, interstate trade and commerce.

## RELEVANT MARKET

13.    The relevant market in this case is no broader than men's and women's country and western apparel and accessories, including cowboy and cowgirl boots, t-shirts, belts, and other goods associated with the country and western lifestyle, sold online through specialty websites devoted to this distinct cluster of products ("the Country and Western Specialty Online Retail Market").  The allegations of fact supporting this market definition are set forth at length in ¶¶ 16-31, below.

14.     Smaller relevant markets within the Country and Western Specialty Online Retail Market may exist as well.

15.     The geographic scope of the Country and Western Specialty Online Retail Market is nationwide.

### Country and Western Specialty Online Retailers Offer a Distinct Cluster of Products and Services to a Distinct Set of Customers

16.     Country and Western Specialty Online Retailers are distinguished from other types of online retailers, and from many traditional "brick and mortar" retailers, by the breadth and depth of their selection of country and western apparel and accessories.  The broad and deep selection of cowboy and cowgirl boots, hats, clothing and accessories available at Country and Western Specialty Online Retailers appeals to a clientele broadly interested in the country and western lifestyle and the products that go with it.  In contrast, other types of online retailers typically carry fewer brands within each product category (e.g., boots or hats), fewer products from each brand, or both.  In this way, Country and Western Specialty Online Retailers offer customers interested in the country and western lifestyle a "one stop shopping" experience that is differentiated from the consumer purchasing experience available through other retail formats.

17.     Country and Western Specialty Online Retailers are also distinguished from other types of online retailers by the look and feel of their websites, which are generally presented in a trade dress evocative of the country and western lifestyle and designed specifically to appeal to consumers interested in that lifestyle.

18.     Country and Western Specialty Online Retailers are also distinguished from brick and mortar retailers by the ease and convenience of online shopping, which the customers served by Country and Western Specialty Online Retailers value.

19.     Country and Western Specialty Online Retailers are generally distinguished from other types of retailers by their incorporation of social media networks into the consumer purchasing experience.  Social media websites are Internet-based applications that allow for the creation and sharing of user-generated content.  Successful and competitively relevant Country and Western Specialty Online Retailers, including Acumen and Sell It Social, are "social commerce" retailers.  Social commerce retailers combine the functionality of social media and e-commerce websites by allowing consumers to share certain aspects of the experience of identifying, selecting and referring for purchase products relevant to their shared interests.  The social nature of the online purchasing experience differentiates Country and Western Specialty Online Retailers from other types of retailers.

20.     The online promotion of goods and services using social media through social commerce websites is an emerging trend in the retail sector.  A 2011 study by consultants Booz & Co. predicted that social commerce would grow 56% from 2010 to 2015, to a $14 billion business in the United States annually.  The 2011 Booz study found that "[c]ompanies that are pursuing social commerce regard it as a distinct channel [from traditional e-commerce retailers] underpinned by a significant new aspect of consumer behavior."

21.     Country and Western Specialty Online Retailers are distinguished from other types of retailers by the customers they serve.  Country and Western Specialty Online Retailers generally rely on access to a committed and engaged base of customers that form communities dedicated to the country and western lifestyle on social media websites such as Facebook, Twitter and others.  By "liking" or "following" social media content associated with the country and western lifestyle, these customers have affirmatively demonstrated an interest in purchasing products associated with that lifestyle.  Country and Western Specialty Online Retailers,

including Acumen and Sell It Social, focus their marketing efforts on these discrete and identifiable groups of consumers with a self-selected interest in country and western apparel and accessories.  By focusing their marketing efforts on this discrete set of customers, Country and Western Specialty Online Retailers can offer products likely to be of special interest to these customers, and often make available for sale to those consumers products already identified by members of that group as being of interest.  In this way, Country and Western Specialty Online Retailers generally offer a curated retail experience that is intended to and does appeal to the interests of discrete groups of self-selecting consumers.

22.     In contrast, brick and mortar retailers and general interest e-commerce websites sell country and western apparel and accessories to customers other than, or in addition to, the specific social-media-using customers served by Country and Western Specialty Online Retailers.  Although many of the customers of brick and mortar retailers and general interest e-commerce websites are also likely users of social media, these other types of retailers do not focus their marketing efforts on the engaged base of social media users that have expressed an interest in the country and western lifestyle, and offer instead products designed to appeal to a broader audience with different tastes and preferences.  As a result, Country and Western Specialty Online Retailers serve a set of customers distinct from those served by other retailers, and provide those customers a distinct cluster of products and services.

**Market Participants Recognize a Distinct
Country and Western Specialty Online Retail Market**

23.     Participants in the Country and Western Specialty Online Retail Market recognize that it is a distinct economic market.

24.     The Defendant acknowledges the Country and Western Specialty Online Retail Market as a distinct economic entity.   Acumen's founder and CEO, John James, has stated publicly that his company's goal is dominance in the Country and Western Specialty Online Retail Market.  He was quoted in the "Arkansas Business" magazine in a March 10, 2014, article entitled *Acumen's Goal: To Own the Southern Lifestyle Marketplace*, as saying that Acumen's goal is "owning the Southern lifestyle category online" and "owning/dominating/winning the Southern Lifestyle category."   On April 23, 2014, in an article in the Fayetteville, Arkansas "Flyer" entitled *Acumen Brands is Quietly Building an E-Commerce Empire in Fayetteville*, James was quoted as stating that Acumen's "goal is to own southern lifestyle online, everything from boots to apparel and accessories, and content."

25.     On its website, Acumen describes the customers of Country Outfitter as a distinct set of customers not directly served by other retail formats: "America's heartland demographic, a group of elusive consumers often neglected by mainstream media and lifestyle brands."

26.     As alleged in ¶ 66, below, Acumen has identified Sell It Social as a unique competitive threat to its Country Outfitter website.   Identification of Sell It Social as a competitive threat is further evidence that Acumen recognizes a distinct Country and Western Specialty Online Retail Market that does not include other retailers of country and western apparel and accessories.

27.     Acumen responded to Sell It Social's entry into the Country and Western Specialty Online Retail Market by increasing its promotional spending.  Specifically, Google ad and keyword data suggests that after three months of declines in Acumen's expenditures for ads and search keywords for Country Outfitter, Acumen increased those expenditures between April and July of 2014, corresponding to Sell It Social's entry into the Country and Western Specialty

7

Online Retail Market.  Acumen has also reduced prices on several boots offered for sale on its website following Country Habit's entry into the market.  These competitive responses by Acumen to Sell It Social's entry further evidence that Acumen recognizes a distinct Country and Western Specialty Online Retail Market that does not include other retailers of country and western apparel and accessories.

28.    Acumen's exclusionary campaign against Sell It Social, as alleged in ¶¶ 66-96, below, is further evidence still that Acumen recognizes a distinct Country and Western Specialty Online Retail Market that does not include other retailers of country and western apparel and accessories, because if Acumen competes in a broader antitrust market, exclusion of Sell It Social would have no effect on market price.

29.    Plaintiff Sell It Social recognizes a distinct Country and Western Specialty Online Retail Market that does not include other retailers of country and western apparel and accessories, as shown by its normal course of business conduct in formulating its pricing and marketing strategies.  Sell It Social tracks the prices of Country Outfitter and other Country and Western Specialty Online Retailers, and considers those prices in setting its own.  Sell It Social also tracks the promotional and marketing campaigns and the Google ad and keyword positions of Country Outfitter and other Country and Western Specialty Online Retailers, and considers those campaigns when formulating its own promotional and marketing efforts.  In contrast, Sell It Social generally does not track or respond to changes in the pricing or marketing strategies of online retailers other than Country and Western Specialty Online Retailers, such as Amazon.com and Zappos.com.

**Prices in the Country and Western Specialty Online Retail Channel Are Distinct**

30.     Prices for country and western apparel and accessories sold through Country and Western Specialty Online Retailers are distinct from those available from brick and mortar retailers.

31.     Prices for country and western apparel and accessories sold through Country and Western Specialty Online Retailers are distinct from the prices for those individual items that are available from online retailers such as Amazon.com or Zappos.com that offer country and western apparel and accessories within their more general and comprehensive retail offerings.

## ACUMEN'S MONOPOLY POWER

32.     Defendant Acumen, through its Country Outfitter website, exercises monopoly power in the Country and Western Specialty Online Retail Market.

33.     Detailed market share information in the Country and Western Specialty Online Retail Market is not currently available to the Plaintiff.  Upon information and belief, Acumen's share of the Country and Western Specialty Online Retail Market is above 60% on a revenue basis.  As alleged in ¶ 56, below, Acumen executives told Sell It Social in February and March 2014 that Country Outfitter was the "largest player" in the Country and Western Specialty Online Retail Market, the single largest online retailer of several vendors serving the Country and Western Specialty Online Retail Market, and the largest online vendor  of cowboy and cowgirl boots.

34.     Due to the significance of social media networks and communities in defining the Country and Western Specialty Online Retail Market, the number of "fans" or "followers" that a given Country and Western Specialty Online Retailer has on various social media sites is an

indirect measure of market share and (in the presence of barriers to entry, alleged in ¶¶ 38-47, below) monopoly power.

35.    The social media community served by Acumen's Country Outfitter brand dwarfs those of its rivals.  According to Acumen's website, Country Outfitter "has built an audience of 8MM Facebook fans and 10MM emails in less than two years."  The next largest Country and Western Specialty Retailers on Facebook are Sell It Social and Boot Barn, both with approximately 2 million fans.  Plaintiff is aware of no other Country and Western Specialty Online Retailer with more than 1 million fans on Facebook, or on any other social media website or collection of websites.  Facebook is the most important source of the engaged social media consumers served by Country and Western Specialty Online Retailers.

36.    Acumen's monopoly power in the Country and Western Specialty Online Retail Market is also demonstrated by its incentive and ability to exclude competitors through anticompetitive conduct, including Sell It Social, as alleged in ¶¶ 66-96, below.  Firms without substantial market or monopoly power lack the incentive to exclude specific competitors from the market, because the remaining rivals will continue to discipline prices even if exclusion is successful.  Firms without substantial market or monopoly power lack the ability to exclude, through anticompetitive conduct, specific competitors from the market because consumers and suppliers can, and will, shift business away from a firm that attempts to act anticompetitively without substantial market or monopoly power.

37.    Acumen's monopoly power in the Country and Western Specialty Online Retail Market is also demonstrated by its ability to coercively impose unwanted contract terms on its vendors, namely, a requirement that Acumen's vendors deal exclusively with Acumen, as alleged in ¶¶ 70-79, below.

10

38.     Acumen's dominant position in the Country and Western Specialty Online Retail Market is protected by substantial barriers to entry, including network effects, learning-by-doing efficiencies, and Acumen's exclusionary conduct.

### The Network Effect Barrier to Entry

39.     Consumer demand for Country and Western Specialty Online Retailers displays positive network effects. A positive network effect is a phenomenon by which the attractiveness of a product or service increases with the number of people using it. The social media component of Country and Western Specialty Online Retail exhibits strong network effects: the more consumers participate in a given community through social media, the more engaging and valuable participation in that community becomes. The dominant size of Acumen's social media network and the wide disparity between the size of Acumen's network and that of its next closest competitor's network is a significant competitive advantage for Acumen.

40.     Because Country and Western Specialty Online Retailers bring together consumers and suppliers, these websites also display what are known as "two-sided" network effects. In a two-sided network, the value of participation on one side of the network (e.g., suppliers) increases with the number of people using the other side of the network (e.g., consumers). As more consumers join Acumen's social media network, Acumen's network becomes more valuable to vendors of country and western apparel and accessories because it allows them to gain access to a greater number of engaged customers and a greater volume of sales opportunities. Similarly, as more vendors of country and western apparel and accessories sell through Acumen's e-commerce platform, Acumen's platform becomes more valuable for consumers because it has a greater number of products for sale, including limited time, customized, or special promotional products, all of which differentiate and enhance the consumer

11

purchasing experience. This positive feedback loop of increasing participation and engagement by vendors and consumers creates a network effect that is a significant competitive advantage for Acumen.

### The Learning-by-Doing Barrier to Entry

41.     Learning from experience is important in many industries, most especially in the early stages of their history. Productivity increases are realized not only as a result of increased capital investment and research and development, but also often as a by-product of the process of production – that is, learning-by-doing.

42.     Social commerce generally, and the Country and Western Specialty Online Retail Market specifically, are emerging markets that are experiencing rapid growth. The scope for learning-by-doing efficiencies in these markets is substantial.

43.     With social commerce websites, learning-by-doing occurs as retailers such as Acumen and Sell It Social acquire the experience and feedback necessary to improve the quality of their product over time. As experience accumulates, retailers learn more about their customers, and are able to better serve those customers through exclusive content, targeted promotions, and interesting interactions that stimulate the growth of an active and engaged community, which in turn attracts additional users and encourages existing users to spend more time in the community.

44.     Country Outfitter's three-year head start in developing its network and content, and the corresponding experience it has accumulated in developing and targeting offers likely to be of interest to its customers on social media websites, is a significant competitive advantage for Acumen in the Country and Western Specialty Online Retail Market.

12

45.     Sell It Social has realized significant learning-by-doing efficiencies relating to social commerce websites generally through its rapid and successful entry into an adjacent market, the online retail of alternative lifestyle, "counter culture," apparel and accessories.  Sell It Social's Rebel Circus website (www.rebelcircus.com) is a social commerce website very similar to its Country Habit website in terms of business model, design and layout.  Launched in March 2013, it has more than 7 million followers on various social media websites, featuring over 7000 products from over 150 vendors.  Rebel Circus has displayed monthly double-digit revenue growth.  The success and growth of Rebel Circus is similar to, and in fact surpasses, that enjoyed by Acumen's Country Outfitter in comparable periods of time.

46.     Thus, although the head start enjoyed by Acumen in the Country and Western Specialty Online Retail Market is a significant entry barrier for those potential entrants that have no experience in social commerce generally, and in particular in social commerce catering to engaged communities of consumers found on existing social media websites, Sell It Social's prior experience with Rebel Circus positioned it uniquely as a likely successful entrant into the Country and Western Specialty Online Retail Market.

### The Exclusionary Conduct Barrier to Entry

47.     Acumen's exclusionary conduct, alleged in detail in ¶¶ 66-96, below, was calculated, to and did have the effect of, deterring vendors of country and western apparel and accessories, including, in particular, vendors of prominent brands of cowboy and cowgirl boots, from doing business with Sell It Social.  Access to a sufficient range of prominent brands of cowboy and cowgirl boots is a necessary input for a business to compete effectively in the Country and Western Specialty Online Retail Market.  Cowboy and cowgirl boots are a symbol of the country and western heritage and lifestyle, and a key component of both a country and

13

western wardrobe and a retailer's inventory.  Retailers without access to a sufficient range of prominent brands of cowboy and cowgirl boots are unable to compete effectively in the Country and Western Specialty Online Retail Market.  Thus, by depriving Sell It Social of access to inputs necessary to compete effectively in the Country and Western Specialty Online Retail Market, Acumen raised barriers to entry and expansion into that market.

## ACUMEN'S EXCLUSIONARY, DEFAMATORY AND TORTIOUS CONDUCT

48.     Acumen has maintained its monopoly in the Country and Western Specialty Online Retail Market through a campaign of exclusionary conduct having the actual and intended purpose and effect of deterring vendors serving the Country and Western Specialty Online Retail Market from dealing with Sell It Social.

49.     Both consumers in the Country and Western Specialty Online Retail Market and Sell It Social are harmed as a result of Acumen's exclusionary conduct.

### Sell It Social's Entry into the Country and Western Specialty Online Retail Market

50.     Sell It Social's entry into the Country and Western Specialty Online Retail Market, and Acumen's anticompetitive and exclusionary response to Sell It Social's entry, were both informed by Sell It Social's rapid and successful entry into an adjacent market using a similar business model through its Rebel Circus website.

51.     Capitalizing on Sell It Social's strategy of marketing to large, loyal, and engaged audiences through various social media platforms such as Facebook, Twitter, and Instagram, Rebel Circus became profitable in its first six months, and its revenues exceeded $3.3 million in its first fiscal year.

52.     With the early success of Rebel Circus validating the Sell It Social business model, and in particular its targeted social media marketing strategy, Sell It Social decided to

enter into the Country and Western Specialty Online Retail Market, and planned to launch the Country Habit website in early 2014.

53.     With the social commerce "know how" gained from already having launched Rebel Circus, Sell It Social was in a strong position to enter the Country and Western Specialty Online Retail Market, having secured an engaged country and western lifestyle audience that exceeded two million consumers prior to the launch of Country Habit, as well as commitments from various vendors in the market to sell their products through the Country Habit website. Sell It Social projected that its first year revenues through Country Habit would more than double those of Rebel Circus's first year.

54.     After preliminary discussions with country and western apparel and boot vendors, many of whom expressed interest in dealing with Sell It Social, Sell It Social made substantial investments to launch Country Habit by cultivating a country and western following through its various social media platforms and hiring employees to manage social media fan pages, grow audiences, and contact vendors, as well as by acquiring a new server, developing an information technology team to build the Country Habit website, and entering into third-party technology partnerships. Acumen learned of Sell It Social's planned entry into the Country and Western Specialty Online Retail Market in February, 2014.

55.     Acumen responded to the threat of Sell It Social's entry by inviting Sell It Social to exchange information about the Country and Western Specialty Online Retail Market generally and Sell It Social's planned entry in particular. Sell It Social engaged in these discussions with the understanding that Acumen may have been considering making an offer to acquire Sell It Social.

56.    In the course of these meetings, which took place in February and March of 2014, Acumen learned of Sell It Social's plan to launch Country Habit, its social media marketing strategy, the engaged country and western audiences that Sell It Social had already built, and the already successfully launched Rebel Circus website.  At these meetings, Ben Roberts, Acumen's Director of Brand Operations and Vice President of Marketing Operations, stated that Country Outfitter was the "largest player" in the Country and Western Specialty Online Retail Market and the largest online retailer of several brands of country and western apparel, including cowboy and cowgirl boots.  Roberts also stated that while Country Outfitter had previously been focused on gaining market share, its strategy was changing in anticipation of a possible initial public offering.   Roberts reported that Country Outfitter now planned to focus on improving profitability and margins rather than market share.  Sell It Social understood Country Outfitter to be planning price increases in the Country and Western Specialty Online Retail Market.

57.    During and after these meetings, Acumen's Roberts and Terry Turpin, Acumen's Chief Operating Officer, stated that Sell It Social's large social media presence, and its successful track record of entry into adjacent social commerce markets, gave Sell It Social significant advantages in entering the Country and Western Specialty Online Retail Market. However, Roberts indicated that Acumen did not believe that Sell It Social would be able to secure access to a sufficient number of key vendors to make Sell It Social's entry a success.

58.    Sell It Social entered into formal contracts with dozens of apparel, accessory and boot vendors in the Country and Western Specialty Online Retail Market to sell their products through Country Habit, as well as informal agreements with other vendors that were enthusiastic about selling their products on Country Habit.

59.     In addition to these contracts and informal agreements, Sell It Social was still approaching vendors in the Country and Western Specialty Online Retail Market when it launched the Country Habit website on April 22, 2014, and it continued to seek out vendors after the launch.

60.     As alleged above, in ¶ 47, access to a selection of prominent brands of country and western cowboy and cowgirl boots is critical to the success of a Country and Western Specialty Online Retailer.

61.     Prominent brands of cowboy and cowgirl boots demanded by consumers in the Country and Western Specialty Online Retail Market include Ariat, Justin, Ferrini, Roper, Stetson, Dan Post and Durango.  While no one of these brands is a "must have" for a new entrant, it is essential to success in the Country and Western Specialty Online Retail Market to establish supply relationships with as many of these prominent brands as possible.  Without a "critical mass" of prominent boot brands, Country and Western Specialty Online Retailers are unable to attract and retain consumers' business.

62.     Sell It Social, therefore, sought out and secured agreements with leading country and western cowboy and cowgirl boot vendors including Ferrini, Karman (vendor of Roper and Stetson brands of boots) and Dan Post, as well as other brands, for the sale of their boots though the Country Habit website.  These boot vendors gave Sell It Social a "critical mass" of boot suppliers sufficient to move forward with its entry, in the hope and reasonable expectation that marketplace success would induce the remaining boot vendors to also sign on with Sell It Social. Acumen's exclusionary conduct, as alleged below, in ¶¶ 66-96, tortiously induced Ferrini and Karman to terminate their contracts, leaving Sell It Social with access to only <u>one</u> vendor's line of prominent cowboy and cowgirl boots.

63.     Many vendors with whom Country Habit secured agreements also had non-exclusive agreements to sell their products through Country Outfitter.

**Acumen Responded to Sell It Social's Entry with Exclusionary Conduct**

64.     In the first two weeks after the Country Habit website went "live" on April 22, 2014, it had stronger sales than Sell It Social's other social commerce website, Rebel Circus, had during its first two weeks of operation.

65.     When the Country Habit website went live, its product offerings were public on its website and available to Acumen.  These offerings included key boot vendor Ferrini as well as numerous other country and western brands (such as Country Junkie Nation, Liberty Wear, Hidden House Products, Outback Trading Company, JPC Equestrian, and Red Barn Ranch). Other brands went up on the Country Habit website during the first two weeks of launch, including key boot vendor Dan Post, as well as Central Texas Leather.  Acumen learned from the County Habit website that, contrary to the doubts Acumen's Roberts had voiced, Sell It Social had demonstrated an ability to attract key vendors.

66.     Acumen recognized that Sell It Social was a unique competitive threat due to the combination of Sell It Social's successful track record as a social commerce retailer and its now-demonstrated ability to attract key vendors.  Acumen responded to this threat with a campaign of exclusionary, tortious and defamatory conduct aimed at disrupting Country Habit's business and restraining competition in the Country and Western Specialty Online Retail Market in order to maintain the dominant market position of its Country Outfitter website.

67.     Acumen's campaign of exclusionary conduct was taken under the pretext that Sell It Social had somehow misappropriated Acumen's trade dress and intellectual property in its Country Outfitter website.

18

68.     As alleged in greater detail below, ¶¶ 80-90, these claims were false and made with a culpable disregard for the truth.  The actual and intended purpose of Acumen's campaign against Sell It Social was to maintain its monopoly in the Country and Western Specialty Online Retail Market, not to redress actual or suspected misappropriation of Acumen's trade dress or intellectual property.

69.     Acumen's exclusionary conduct has taken two forms.   First, it has adopted, communicated, and threatened to enforce a policy of refusing to deal with vendors that do business with Sell It Social (the "Exclusive Dealing Policy").   Acumen's Exclusive Dealing Policy was imposed on vendors coercively and without justification.   Second, Acumen has disseminated false, misleading, and defamatory claims to those same vendors about Sell It Social and its management.   Both forms of exclusionary conduct have the purpose and effect of deterring vendors in the Country and Western Specialty Online Retail Market from doing business with Sell It Social, and thereby maintaining Acumen's monopoly.

**Acumen's Exclusive Dealing Policy**

70.     Acumen's Exclusive Dealing Policy is, and has been, communicated orally and in writing to vendors supplying the Country and Western Specialty Online Retail Market.  In these communications, Acumen intends to, and does, convey to vendors the terms of its Exclusive Dealing Policy: vendors that do business with Sell It Social risk not being permitted to sell through Country Outfitter.  Vendors understand that these are Acumen's terms and, as a result, refrain from dealing with Sell It Social in the Country and Western Specialty Online Retail Market.

71.     Acumen's Exclusive Dealing Policy was communicated to vendors in writing by Acumen's CEO on May 5, 2014, just weeks after Sell It Social's entry in to the Country and

Western Specialty Online Retail Market.  In that letter, Acumen exhorted its vendors to refuse to

deal with Sell It Social and implicitly threatened to refuse to deal with vendors that chose to deal

with Sell It Social.

72.    Acumen's May 5, 2014, letter (annexed as Exhibit A) was signed by its CEO,

John James, and states (with emphasis added by the Plaintiff):

> Dear Valued Supplier,
>
> This Letter will serve as notice regarding our position towards the website Country
> Habit.com.  We find their blatant use of our CountryOutfitter.com designs, imagery and
> intellectual property deplorable.
>
> Our entire industry was built around trust, honesty, and respect.  Country Habit chose to
> enter our industry without any of these tenants [*sic*].
>
> After an initial discussion with their leadership, Country Habit retracted their most
> flagrant abuses but continues to use tactics of seeming association with Country Outfitter
> to try and secure products from our supplier base.  ***We ask that you take into full
> consideration forgoing [sic] all current or future business with this company.***
>
> ***We value and appreciate the partnership we have built with your brands, and we trust
> you understand our position and will stand alongside us.***
>
> Sincerely,
> John James, M.D.
> CEO-Country Outfitter

73.    Vendors in the Country and Western Specialty Online Retail Market that have

learned of Acumen's Exclusive Dealing Policy have terminated their contracts with Sell It Social

as a result.  Other vendors interested in doing business with Sell It Social have similarly

refrained from doing so as a result of Acumen's Exclusive Dealing Policy.

74.    Acumen's Exclusive Dealing Policy has deterred, and continues to deter, vendors

from doing business with Sell It Social because exclusion from Acumen's Country Outfitter

website would risk the loss of substantial revenues and profits for these vendors.  Acumen is, in

many cases, the largest online retailer of these vendors' products. Vendors are unwilling and unable to do business with Sell It Social under the "all or nothing" terms imposed by Acumen.

75.     Some of the vendors that have terminated their contracts with Sell It Social, or otherwise refrained from doing business with Sell It Social, are vendors of prominent brands of cowboy and cowgirl boots. As alleged above (¶¶ 47, 60) access to cowboy and cowgirl boots is necessary to compete effectively in the Country and Western Specialty Online Retail Market.

76.     In particular, and as alleged in detail in ¶¶ 92-93, below, key boot vendors Ferrini and Karman have each terminated their relationships with Sell It Social, along with Country Deep (a supplier of country and western theme T-Shirts), Ricochet Rounds (bullet-based jewelry), Bella Vita (jewelry), and Hidden House Products (specialty leather goods). Some vendors (including Ferrini and Ricochet Rounds) cancelled agreements with Sell It Social within twenty-four hours of receiving Acumen's letter. Other vendors, such as American Hat Company, Dixieland Charm (jewelry), and Nothing But Rodeo (t-shirts and rodeo apparel) each confirmed that they were initially enthusiastic about doing business with Country Habit, but then became unresponsive to Sell It Social after Acumen began its campaign of exclusionary conduct.

77.     Acumen's Exclusive Dealing Policy has foreclosed Sell It Social from a substantial portion of the prominent cowboy and cowgirl brands desired by consumers in the Country and Western Specialty Online Retail Market.

78.     By foreclosing Sell It Social from a substantial portion of the prominent cowboy and cowgirl brands desired by consumers in the Country and Western Specialty Online Retail Market, Acumen has degraded the quality of Sell It Social's Country Habit website and retail offering, caused lost sales to Sell It Social through Country Habit, and diminished the ability of

Sell It Social to compete with Acumen, and thereby to discipline Acumen's exercise of monopoly power.

79.     A requirement of exclusivity on the part of vendors is not the norm in the Country and Western Specialty Online Retail Market.  Vendors typically sell products simultaneously through a number of competing Country and Western Specialty Online Retailers because widespread distribution enhances sales and output.  The imposition of exclusivity by Acumen is an aberrant departure from industry practice that tends to reduce output, and is therefore undesirable from the standpoint of vendors and consumers.

**Acumen's Dissemination of False, Misleading and Defamatory Statements**

80.     The May 5, 2014, letter, sent by Acumen's CEO to vendors in the Country and Western Specialty Online Retail Market, is false and defamatory in that it falsely claims that the Country Habit website uses Country Outfitter's website designs, imagery and intellectual property.

81.     The design and layout of Country Habit's website is not based upon Country Outfitter's site in any respect, but is instead a replica of Sell It Social's previously developed Rebel Circus website.

82.     Sell It Social's social media marketing plan for Country Habit mimics the social media marketing plan it employed for Rebel Circus in the rebel and alternative lifestyle market, and is not based upon any proprietary information of Country Outfitter or Acumen.

83.     The letter sent by Acumen is also false in that it states that Country Habit entered the Country and Western Specialty Online Retail Market without trust, honesty, or respect. Trust, honesty and respect are foundational tenets of Country Habit and Sell It Social.

22

84.     Acumen either knew that the claims that Country Habit had misappropriated and used Country Outfitter's designs, imagery and intellectual property, and that Country Habit entered the Country and Western Specialty Online Retail Market without trust, honesty and respect were false, misleading, and unsupported, or was reckless as to the truth of such statements, and it made those statements either recklessly or with intent to deceive.   In the alternative, Acumen was, at a minimum, negligent in making false statements about Sell It Social.

85.     Acumen's claims that Sell It Social misappropriated and used Acumen's designs, imagery and intellectual property are a cynical attempt to exploit an error that resulted in an innocuous website mock-up or "skin" of the Country Outfitter website being accessible on March 11, 2014, for a period of only hours.   This occurred more than six weeks before the launch of the Country Habit website.

86.     As Acumen should well know, "skinning" is a common research and diligence practice used in website development.   In this instance, an independent information technology contractor prepared a "skin" of the Country Outfitter website as part of his research and diligence in preparing the Country Habit website.   The independent information technology contractor substituted the name "Country Habit" for "Country Outfitter" in the "skin" as part of a diligence exercise in which he viewed and rearranged country-themed images, brand logos and potential logos for Country Habit in order to visualize potential layouts for the Country Habit website.   He also prepared the "skin" as part of his attempt to identify any unique attributes of country and western wear that would need to be accounted for in the website layout.   He then uploaded the "skin" to the URL web address for Country Habit as a placeholder without ever intending that it would be made public, and without Sell It Social's knowledge.   The "skin" website never had the

functionality necessary to make it usable for commerce: customers could not view or select products or make purchases. As a result of an inadvertent error, it was publicly available online for a short period of time, believed to be no more than 8-12 hours, before Sell It Social recognized the error and made it unavailable.

87.     The Country Habit website that Sell It Social actually launched neither resembles nor is based upon Acumen's Country Outfitter website. Instead, the Country Habit website design is based upon and closely resembles Sell It Social's other e-commerce website, www. rebelcircus.com.

88.     In response to the inadvertent error that resulted in the brief public availability of the website "skin," Acumen's Ben Roberts wrote to Sell It Social's President, Heath Wolfson, in a text message on March 11, 2014: "No worries, not the first time people have accidentally or purposefully copied part of our site. We had someone copy our squeeze page code down to the analytics id once." Roberts then sought a meeting with Wolfson the following week, again under the guise of exploring common business goals and exchanging information, at Sell It Social's offices.

89.     Acumen knows that Sell It Social did not misappropriate or use Acumen's designs, imagery and intellectual property because it has online access to www.countryhabit.com, which clearly does not resemble www.countryoutfitter.com or the "skin" website that was publicly available for a short period of time, and because Ben Roberts met with Sell It Social on March 20, 2014, after the "skin" was inadvertently made publicly available, and knew at that time that Sell It Social's Country Habit website was not functional and would not become functional for several weeks.

90.     Country Outfitter's conduct in falsely stating to vendors in the Country and Western Specialty Online Retail Market that Country Habit entered that marketplace without trust, honesty and respect was maliciously calculated to destroy Sell It Social's business, since trust, honesty and respect are essential to the relationship between a social commerce retailer and its vendors.

91.     Acumen's defamation of Sell It Social did not end with the May 5, 2014, letter. Acumen continues to falsely communicate to vendors that Sell It Social and its principals have misappropriated its trade dress and intellectual property.   In particular, a representative of Acumen told Ferrini that Sell It Social "copied their code" and "stole their site with intention to create confusion in the marketplace."

92.     As a result of Acumen's threatening and defamatory letter, vendors who had entered into agreement with Sell It Social terminated those agreements.   But for Acumen's conduct, those vendors would have continued as suppliers of Sell It Social.   They include:

   a.  **Ferrini** is a boot vendor.   Sell It Social negotiated a contract with Ferrini for Ferrini to supply boots to be sold on the Country Habit website.   The contract was executed on April 14, 2014.   Ferrini's boots were available on the Country Habit website from the first day it launched, on April 22.   On May 6, within 24 hours of Acumen's threatening and defamatory letter, Ferrini wrote to Sell It Social to advise that Ferrini was terminating its vendor agreement with Sell It Social. Acumen sells Ferrini products on the Country Outfitter website, and Country Outfitter is among the leading purchasers of Google ads and keywords related to Ferrini and Ferrini Boots.   Ferrini subsequently acknowledged to Sell It Social that Ferrini made the decision to terminate its relationship with Country Habit in

response to Acumen's threatening and defamatory letter, and it stated that Acumen had told it that Sell It Social "copied their code" and "stole their site with intention to create confusion in the marketplace."

b. **Karman** is a vendor of western apparel, including the famous Roper and Stetson brands of boots. On April 9, 2014, a representative of Karman confirmed that it intended to sell its products on the Country Habit website. On April 15, Karman supplied UPC codes, product descriptions, and pricing information to Sell It Social in preparation for its sales on the Country Habit website. On May 5, Karman returned to Sell It Social a fully-executed contract for Roper and Stetson boots to be sold on the Country Habit website. Shortly thereafter, and after Acumen distributed its threatening and defamatory letter, Sell It Social requested additional product details from Karman in connection with its preparation to sell its products on the Country Habit website. Sell It Social never received a response to this inquiry or any further communication from Karman. Acumen sells Roper and Stetson products on the Country Outfitter website and is among the leading purchasers of Google ads and keywords related to Stetson Boots.

c. **Country Deep** is a vendor of country and western themed T-shirts. Acumen sells Country Deep products on the Country Outfitter website. On May 1, 2014, Country Deep expressed enthusiasm for supplying T-shirts to be sold on the Country Habit website, stating in a May 1 e-mail that it was "excited to work with" Country Habit. Country Deep returned to Country Habit a fully executed contract on May 6, 2014, the day after Acumen's threatening and defamatory letter was distributed to vendors. Shortly thereafter, Country Deep terminated the

26

agreement with Sell It Social. Country Deep acknowledged to Sell It Social that it made this decision in response to Acumen's letter.

d. **Ricochet Rounds** is a vendor of country and western style jewelry that incorporates bullets into its designs. Acumen sells Ricochet Rounds products on the Country Outfitter website. Ricochet Rounds executed an agreement to supply jewelry to be sold on the Country Habit website on April 30, 2014. On May 5, within hours of Acumen's distribution of its threatening and defamatory letter, Ricochet Round requested that Sell It Social consider the contract Ricochet Rounds had executed as "null and void," offering as an explanation only that "we decided it was not in the best interest of our business at this time."

e. **Bella Vita Jewelry** is a vendor of country and western style jewelry. Acumen sells Bell Vita Jewelry products through the Country Outfitter website. Bella Vita Jewelry executed an agreement to supply goods to be sold on the Country Habit website on March 11, 2014. On May 12, seven days after Acumen distributed its threatening and defamatory letter, Bella Vita Jewelry requested that Sell It Social wait at least until June before adding its products to the Country Habit website. Since then, Bella Vita Jewelry has not responded to communications from Sell It Social.

f. **Hidden House Products** is a vendor of leather products, including wallets and bags. Acumen sells Hidden House Products through the Country Outfitter website. Hidden House Products executed an agreement to supply goods to be sold on the Country Habit website on March 12, 2014. Hidden House Products terminated this agreement on May 23 without explanation.

27

93.     Also as a result of Acumen's threats and defamation, vendors who would have entered into agreements to supply Sell It Social – but for Acumen's conduct – declined to do so. For example:

a.   **American Hat** is a vendor of cowboy and cowgirl hats.  Acumen sells American Hat products on the Country Outfitter website.  When Sell It Social contacted American Hat in March 2014, American Hat expressed enthusiasm about supplying hats to be sold on the Country Habit website.  It requested a dealer application and a credit check, in addition to references.  On May 13, eight days after Acumen's threatening and defamatory letter, American Hat claimed to Sell It Social that it was still waiting to hear from Sell It Social's references.  Since then, American Hat has not responded to communications from Sell It Social.

b.   **Dixieland Charm Jewelry** is a vendor of country and western themed jewelry.  Acumen sells Dixieland Charm Jewelry products on the Country Outfitter website.  During discussions between Sell It Social and Dixieland Charm Jewelry in late April and early May 2014, Dixieland Charm Jewelry expressed enthusiasm and confirmed orally that it intended to supply its products for sale on the Country Habit website.  Specifically, Eric W. Billings, the owner of Dixieland Charm Jewelry wrote in an email to Sell It Social's Morgan Lipper on April 30, 2014, "We would love to discuss the opportunity of selling our products on your website."  After further discussion, Billings wrote in an email to Lipper on May 3, 2014, "We are interested in this opportunity! What do you need from us? A data spreadsheet with pricing? Images? Our company bio?  Just let us know."  Sell It Social then sent a proposed agreement to Billings on May 6, one day after

28

Acumen's threatening and defamatory letter.  Dixieland Charm Jewelry has never responded.

c. **Nothing But Rodeo** is a vendor of T-shirts and rodeo apparel.  Acumen sells Nothing But Rodeo products on the Country Outfitter website.  Nothing But Rodeo expressed enthusiasm about working with Sell It Social, and requested a contract on April 28, 2014.  Sell It Social provided a contract that day.  Nothing But Rodeo responded on May 13, eight days after Acumen's distribution of its threatening and defamatory letter, and stated that its inventory was dedicated to rodeo events and would not be replenished until after the summer.  Meanwhile, the Country Outfitter website features "flash sales" of Nothing But Rodeo products, and features those products on its "MarketPlace" website.

94.     The vendors who would have supplied Sell It Social but for Acumen's conduct included two key boot vendors: Ferrini and Karmen.

95.     Vendors including Ferrini and Country Deep have confirmed that Acumen sent them its defamatory letter.  Upon information and belief, Acumen sent the letter to all of its suppliers of country and western apparel and accessories, which together constitute a large majority of such vendors.  Acumen also sent the letter to vendors of country and western apparel and accessories with whom it was not doing business at the time, including J.A.C.H.S., a clothing vendor.

96.     Acumen knew that these suppliers either had existing or prospective business relationships with Sell It Social, because it knew that Sell It Social planned to enter the Country and Western Specialty Online Retail Market, and that to do so it would need to enter into supply agreements with vendors of country and western boots, apparel, and accessories.  Indeed, as

29

alleged in ¶ 57 above, Ben Roberts of Acumen cited Sell It Social's need to secure agreements with suppliers of country and western boots, apparel, and accessories, as a challenge that Sell It Social would face in entering the market. Acumen's threatening and defamatory May 5 letter itself states that Sell It Social was attempting to "try and secure products from our supplier base." In the cases of Ferrini and Hidden House Products, Acumen knew that Sell It Social had succeeded in negotiating agreements with those vendors because their products were available on the Country Habit website from its first launch.

## Injury to Sell It Social

97.    Acumen's conduct has caused lost sales and lost profits for Sell It Social in the Country and Western Specialty Online Retail Market. The network effects and learning-by-doing efficiencies that characterize the Country and Western Specialty Online Retail Market ensure that lost sales today cause additional lost sales and profits in the future, as Acumen denies Sell It Social the opportunity to compete for and win the sales today that will allow Sell It Social to become an even more effective competitor in the future.

98.    The first sixty days of an e-commerce website's launch are critical in the eyes of investors. Acumen's campaign of intimidating and coercing Country Habit's vendors to dissuade them from doing business with Sell It Social has destroyed the momentum of the Country Habit launch, causing extensive damage to Sell It Social.

99.    Acumen had known for several months that Sell It Social was recruiting vendors, obtaining fans, and otherwise preparing to enter into the Country and Western Specialty Online Retail Market, yet intentionally and deliberately waited until the time of the Country Habit website launch to begin a campaign to disparage Sell It Social in order to thwart the launch of Country Habit and destroy Sell It Social's business. Sell It Social's business model is based

30

upon it having a platform by which it can launch multiple successful social commerce websites into different marketplaces supporting different communities of consumers, and a failure to successfully launch its second social commerce website will discourage potential vendors and venture capital investor interest, as well as destroy company morale, jeopardize employees' jobs, and stall the company's growth.

### Injury to Consumers

100.    The harm Acumen has caused to Sell It Social's ability to compete effectively in the Country and Western Specialty Online Retail Market has harmed competition in that market, likely leading to increased prices and reduced innovation and consumer choice.  In particular, Sell It Social's unimpeded entry into the Country and Western Specialty Online Retail Market would likely have constrained Acumen's ability to implement the price increases it plans in preparation for an initial public offering.

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST ACT –
### MONOPOLIZATION

101.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 100 as fully set forth herein.

102.    Acumen has willfully acquired and maintained monopoly power in the Country and Western Specialty Online Retail Market through anticompetitive means, in violation of Section 2 of the Sherman Antitrust Act.

### SECOND CLAIM FOR RELIEF:
### VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST ACT –
### ATTEMPTED MONOPOLIZATION

103.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 102 as fully set forth herein.

104.    Acumen has engaged in exclusionary and anticompetitive conduct with a specific intent to monopolize the Country and Western Specialty Online Retail Market and a dangerous probability of achieving monopoly power, in violation of Section 2 of the Sherman Antitrust Act.

## THIRD CLAIM FOR RELIEF:
## DEFAMATION – LIBEL

105.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 104 as fully set forth herein.

106.    Acumen disseminated a false and defamatory letter to Sell It Social's vendors and prospective vendors maliciously, with the intent to disparage Sell It Social and damage its business, and did so without privilege or authorization.  In the alternative, Acumen was at least negligent in making false statements about Sell It Social.

107.    Acumen's statements constitute libel *per se* because they impugned the basic integrity and competence of Sell It Social's business, and therefore had a tendency to injure Sell It Social in its business.

108.    In addition, Sell It Social has suffered damage in an amount to be determined at trial based on Acumen's false and defamatory conduct through (a) loss of business from existing vendors that had agreed to sell their products on Country Habit, (b) loss of business caused by Acumen's interference with potential vendors and business relationships it had cultivated in the Country and Western Specialty Online Retail Market, and (c) damage to Sell It Social's core business as a result of the potential failure of the Country Habit website and resultant failure of investors to support that business.

32

## FOURTH CLAIM FOR RELIEF:
## <u>DEFAMATION – SLANDER</u>

109.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 108 as fully set forth herein.

110.    Acumen made false and defamatory statements to Sell It Social's vendors and prospective vendors maliciously, with the intent to disparage Sell It Social and damage its business, and did so without privilege or authorization.  In the alternative, Acumen was at least negligent in making false statements about Sell It Social.

111.    Acumen's statements constitute slander *per se* because they impugned the basic integrity and competence of Sell It Social's business, and therefore had a tendency to injure Sell It Social in its business.

112.    In addition, Sell It Social has suffered damage in an amount to be determined at trial based on Acumen's false and defamatory conduct through (a) loss of business from existing vendors that had agreed to sell their products on Country Habit, (b) loss of business caused by Acumen's interference with potential vendors and business relationships it had cultivated in the Country and Western Specialty Online Retail Market, and (c) damage to Sell It Social's core business as a result of the potential failure of the Country Habit website and resultant failure of investors to support that business.

## FIFTH CLAIM FOR RELIEF:
## INTENTIONAL TORTIOUS INTERFERENCE
## <u>WITH PROSPECTIVE BUSINESS ADVANTAGE</u>

113.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 112 as fully set forth herein.

114.    Acumen knew that Sell It Social was cultivating business relationships with vendors of country and western apparel and accessories, including cowboy and cowgirl boots, and that it had already entered into relationships with some vendors.

115.    Acumen disseminated the disparaging and defamatory letter to Sell It Social's existing vendors and prospective vendors with the intent to interfere with Sell It Social's existing business relationships and its prospective business relationships.

116.    Acumen acted maliciously with the sole intent to harm or destroy Sell It Social's business in the Country and Western Specialty Online Retail Market.

117.    As a result of Acumen's wrongful conduct, vendors who entered into supply agreements with Sell It Social that they otherwise would have continued (including but not limited to Ferrini, Karman, Country Deep, Ricochet Rounds, Bella Vita Jewelry, and Hidden House Products) have terminated these relationships.

118.    As a result of Acumen's wrongful conduct, vendors who otherwise would have entered into supply agreements with Sell It Social (including American Hat, Dixieland Charm Jewelry, and Nothing But Rodeo) have declined to do so.

119.    Sell It Social has been damaged, in an amount to be determined at trial, as a direct, foreseeable, and proximate result of Acumen's interference with its prospective business relationships through (a) loss of business from existing vendors that had agreed to sell their products on Country Habit, (b) loss of business caused by Acumen's interference with potential vendors and business relationships that Sell It Social had cultivated in the Country and Western Specialty Online Retail Market, and (c) damage to Sell It Social's core business as a result of the potential failure of the Country Habit website and resultant failure of investors to support that business.

34

**WHEREFORE**, the Plaintiff demands a trial by jury and that judgment be entered in its favor, against Defendant Acumen Brands, Inc., as follows:

a)       On the First Claim for Relief, awarding compensatory damages in accordance with the federal antitrust laws in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars ($50,000,000.00), together with an award of treble damages, post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

b)       On the Second Claim for Relief, awarding compensatory damages in accordance with the federal antitrust laws in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars ($50,000,000.00), together with an award of treble damages, post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

c)       On the Third Claim for Relief, awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars ($50,000,000.00), together with an award of punitive damages based on defendant's malicious conduct, pre-judgment and post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

d)       On the Fourth Claim for Relief, awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars ($50,000,000.00), together with an award of punitive damages based on defendant's malicious conduct, pre-judgment and post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

e)      On the Fifth Claim for Relief, awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than Fifty Million Dollars ($50,000,000.00), together with an award of punitive damages based on defendant's malicious, defamatory conduct, pre-judgment and post-judgment interest at the legal rate, and Plaintiff's costs, expenses, and reasonable attorneys' fees;

f)      Enjoining Acumen from further violations of the antitrust laws pursuant to 15 U.S.C. § 26; and

g)      Such other and further relief as the Court may deem just and proper.

Dated: White Plains, New York
       July 25, 2014

**POLLOCK & MAGUIRE, LLP**

By: _____

Peter S. Dawson (PD1618)
*A Member of the Firm*
Attorneys for Plaintiff
4 West Red Oak Lane, Suite 302
White Plains, New York 10604
T: 914-251-1525
F: 914-251-0662
pdawson@pollock-maguire.com

-and-

**BOIES, SCHILLER & FLEXNER LLP**

Edward Normand
Nathan Holcomb
333 Main Street
Armonk, New York 10504
T: 914-749-8200
F: 914-749-8300
enormand@bsfllp.com
nholcomb@bsfllp.com

36

Richard A. Feinstein (admitted pro hac vice)
Christopher G. Renner (admitted pro hac vice)
5301 Wisconsin Ave. NW
Washington, DC 20015
T: (202) 237-2727
F:  (202) 237-6131
rfeinstein@bsfllp.com
crenner@bsfllp.com

# EXHIBIT A



May 5, 2014

Dear Valued Supplier,

This letter will serve as notice regarding our position towards the website CountryHabit.com. We find their blatant use of our CountryOutfitter.com designs, imagery, and intellectual property deplorable.

Our entire industry was built around trust, honesty, and respect. Country Habit chose to enter our industry without any of these tenants.

After an initial discussion with their leadership, Country Habit retracted their most flagrant abuses but continues to use tactics of seeming association with Country Outfitter to try and secure products from our supplier base. We ask that you take into full consideration forgoing all current or future business with this company.

We value and appreciate the partnership we have built with your brands, and we trust you understand our position and will stand alongside us.

Sincerely,

John James, M.D.
CEO - Country Outfitter